# IN THE COURT OF APPEALS OF IOWA

No. 22-0109
Filed May 10, 2023

IN RE THE MARRIAGE OF BRIDGET JO WALKER
AND TERRY CHARLES WALKER

Upon the Petition of
BRIDGET JO WALKER,
        Petitioner-Appellee,

And Concerning
TERRY CHARLES WALKER,
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Tama County, Mary E. Chicchelly,

Judge.


        Terry Walker appeals the economic provisions of the decree dissolving his

marriage to Bridget Walker. **AFFIRMED AND REMANDED.**


        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellant.

        John J. Hines of Dutton, Daniels, Hines, Kalkhoff, Cook & Swanson, P.L.C.,

Waterloo, for appellee.


        Considered by Bower, C.J., and Greer and Badding, JJ.

        Chicchelly, J., takes no part.

**BADDING, Judge.**

"I work every day, and so can she," said Terry Walker at the trial to dissolve his nearly twenty-five-year marriage to Bridget Walker, who was seeking spousal support from him. But Bridget had spent most of that marriage helping Terry run his lawn care business—work she could no longer do after their separation and her move to Florida, where she was employed full time at a resort. In its dissolution decree, the district court granted Bridget's request for spousal support and, after finding Terry "rather lacking in credibility," mostly adopted her proposed property division. Terry appeals.

**I.      Background Facts and Proceedings**

Terry and Bridget Walker married in 1997. They had two children together, though only one was still a minor at the time of trial.[1] About two years before their marriage, Terry started a lawn care business called Turf-Pro. Bridget began working for the business about a year later. The parties grew the business together during the marriage, with both working for it on a full-time basis. Bridget handled mowing, data entry, and bookkeeping. While Terry's duties were not spelled out at trial, he testified: "I am the business."

The parties separated in July 2019. Bridget and the minor child moved to Florida and began living in a one-bedroom condo the parties bought in 2018 for $172,000.00. To pay for the condo, they took out a $30,000.00 loan, secured by a mortgage on their marital home in Iowa. The rest came from some marital funds Bridget said she saved over the years, along with an inheritance of $57,521.46

---

[1] Legal custody, physical care, child support, and any other matters related to the child are not at issue in this appeal.

from her father's estate and roughly $20,000.00 in cash that Bridget testified she found in her parents' home after the estate closed. The loan was paid off before Bridget and the child moved into the condo in 2019.

When the parties separated, Bridget took a 2018 Chevrolet Equinox with her to Florida. That vehicle was destroyed by Hurricane Sally, leaving Bridget without a vehicle for some time. Bridget and the parties' minor child were also without health insurance for several months after Terry canceled their policy in April or May 2020. Bridget petitioned for divorce in July, following which she applied for temporary spousal support and the insurance proceeds that Terry had received for the totaled Equinox. The court granted both requests. Despite this order, Terry withheld $2000.00 from the proceeds he was ordered to pay to Bridget.

For tax year 2020, Terry issued Bridget a 1099-NEC form, stating she had received $22,002.61 in nonemployee compensation. Terry at first testified this was for Bridget's work in preparing "the taxes and mowing statements in 2020," even though Bridget testified that she did not work for Turf-Pro at all that year. On cross-examination, Terry agreed that he just "total[]ed up all payments that were made on what [he] considered [Bridget's] behalf," for things like the health insurance premium for her and the child, to arrive at that amount. The parties' tax returns show that in previous years, Bridget never received a 1099 approaching that amount. In another first, Terry claimed that in 2020, he paid his father $20,000.00 in rent for a building where Turf-Pro's equipment and chemicals were stored. But Bridget testified they had been using that building for more than twenty years and never paid Terry's father any rent.

By the time the case went to trial in December 2021, Bridget was fifty-two years old and, according to Terry, in good health. She graduated high school but did not pursue any post-secondary education or training. Her work experience was limited to Turf-Pro until the parties separated, when she began working full time at a resort in Orange Beach, Alabama. She earns $12.74 per hour, plus tips that in 2020 totaled $2374.00. Bridget testified her income was pretty standard for the tourist industry where she lives and works. Terry was fifty-one years old and also in good health at the time of trial. He continues to run the Turf-Pro business, but the slim record does not reveal much else about him. The district court found Bridget's gross annual income was $28,000.00, while Terry's was $86,000.00, which the court said translated into a net monthly income of $2000.00 for Bridget and $4682.34 for Terry. Neither party disputes those figures.

Bridget explained the parties lived comfortably during the marriage. They went on vacations, didn't "penny pinch," and always drove nice vehicles. Bridget testified that she could not meet her ongoing monthly expenses of $3332.00 on her income and the stipulated amount of child support ($700.00 per month). In contrast, Terry went on several vacations after the parties separated—Hawaii, the Virgin Islands, Las Vegas, Nashville, and Chicago—though he said they were "business related trips" for "turf specialists" and "[l]awn care people." Bridget requested $600.00 per month in spousal support until she reached retirement age and could claim Social Security. But Terry believed Bridget was underemployed, testifying: "She's a bookkeeper. She ran the mowing crew, so she's a manager. She has a lot of skills." As a result, Terry testified he shouldn't have to pay her spousal support.

Although Terry touted Bridget's bookkeeping skills, he questioned her valuation of Turf-Pro. Bridget estimated the business was worth $150,000.00 based on its established nature, loyal customer list, equipment, and income. But according to Terry, the business was worth nothing without him—though he acknowledged its equipment was "worth something." Yet neither party specified what equipment was owned by the business. Both listed a 2017 Ford F-350, two 2013 Ford F-250s, and a 2013 Jeep on their proposed property distributions. Bridget, however, listed those vehicles separately from the business while, as noted, Terry did not value the business at all. He also failed to include his hunting and fishing equipment, a Polaris side-by-side, or a Camaro that Bridget said he owned, and he removed a camper and four-wheeler that had been on an earlier affidavit of financial status. For her part, Bridget did not value jewelry that she said Terry gave her during the marriage.

The district court did what it could with these bare-bones facts. In its spousal-support analysis, the court found that Bridget needed spousal support because she had a budget deficit of roughly $1300.00 before child support was factored in. As for Terry, the court found that while he claimed $3170.00 in monthly expenses from his net monthly income of $4682.34, most expenses were covered by the business. Adding in Terry's ability to take multiple vacations since the parties' separation, a luxury Bridget had not enjoyed, the court found he had an ability to pay spousal support. Overall, the court explained:

> Because of the lengthy term of this marriage, the fact that Bridget was previously employed for most of the marriage in the family business and has not had any post-secondary schooling, and because Bridget now resides in a geographical area where the pay for her skill level is not high, the Court finds that Bridget's request for

permanent alimony is reasonable under the circumstances of this case. Moreover, the imposition of an award of alimony will serve to provide Bridget with a standard of living that is more commensurate with the standard of living she enjoyed during the course of the parties' marriage.

The court accordingly awarded Bridget monthly spousal support of $600.00 until the first of either party's death, Bridget's remarriage, or Bridget reaching the age of sixty-five.

As for property division, the parties agreed before trial they had "each received the property they want, including real estate and investments as well as most personal property." But they disagreed about the value of some of that property, including Turf-Pro, the condo in Florida, and some miscellaneous items like the side-by-side, hunting and fishing equipment, the Camaro, and Bridget's jewelry. After hearing from both parties, the court questioned Terry's candor and found "Bridget's overall approach and testimony to be more believable." Those findings led the court to adopt most of Bridget's valuations, which resulted in the court requiring Terry to make an equalization payment of $95,784.14 to Bridget.

Terry appeals, challenging both the property-distribution and spousal-support provisions of the dissolution decree.

## II. Standard of Review

We review dissolution proceedings de novo. Iowa R. App. P. 6.907; *see In re Marriage of Pazhoor*, 971 N.W.2d 530, 537 (Iowa 2022). While we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them. Iowa R. App. P. 6.904(3)(g); *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007). The district court's

decree will be disturbed only upon a failure to do equity. *In re Marriage of Hansen*, 886 N.W.2d 868, 871 (Iowa Ct. App. 2016).

## III.    Analysis

### A.    Property Distribution

Marital property is to be divided equitably, considering the factors in Iowa Code section 598.21(5) (2020). *In re Marriage of McDermott*, 827 N.W.2d 671, 678 (Iowa 2013). "Courts determine what is fair and equitable based on the particular circumstances of the parties." *In re Marriage of Keener*, 728 N.W.2d 188, 193 (Iowa 2007). "Although an equal division is not required, it is generally recognized that equality is often most equitable." *Id.* (quoting *In re Marriage of Rhinehart*, 704 N.W.2d 677, 683 (Iowa 2005)).

Terry claims the district court's property division was inequitable because the court improperly (1) "considered business assets twice," (2) "excluded marital funds from its determination of the Florida condominium value and undervalued the property," (3) "included non-marital personal property and misvalued marital personal property," and (4) "did not include Bridget's jewelry."

Before digging into these claims, we observe that the evidence on property and its valuation was as slim as it was contradictory. In our view, all of the claimed errors on appeal result from Terry's lack of candor with the district court and his attempts to conceal assets, which we keep in mind as we review the court's distribution. *See In re Marriage of Hanson*, 475 N.W.2d 660, 663 (Iowa Ct. App. 1991) ("Since it is apparent it was [the husband's] machinations and deviousness which created the very problem he complains of, he may not now assert the trial court's ruling is inequitable."); *see also In re Marriage of El Krim*, No. 16-1620,

2017 WL 2465806, at *9 (Iowa Ct. App. June 7, 2017) (finding a husband "gains nothing by exploiting his own failure to come forward with accurate information about his assets"); *In re Marriage of Wenner*, No. 03-0647, 2004 WL 1853922, at *1 (Iowa Ct. App. July 14, 2004) ("Concealing assets not only affects credibility, it also may be considered in determining an equitable division of property.").

### 1. Business assets and vehicles

Terry argues the district court "wrongly considered business assets twice in determining property division." Beginning with the 2018 Equinox, Terry submits that, while "it is unclear whether the court consider[ed] the Chevy Equinox's value when determining the value of Turf-Pro," it is safe to assume it was considered in valuing the business. But there is no indication in the court's decree that it considered the Equinox, or the insurance proceeds from it, as an asset of the business. The court simply noted the vehicle *was* owned by the business, it was totaled, and the proper funneling of the proceeds for that vehicle was already resolved, save for Terry's failure to pay Bridget all of the proceeds.

Moving on, Terry's main complaint is that the court "double-counted" certain vehicles by considering them in its valuation of the business and then assigning them values independent of the business in its property-distribution ledger. For relief, he requests removal of the three Ford trucks and the 2013 Jeep awarded to him as individual assets. Terry also claims that the "court counted a 2018 Ford F250 that does not exist." Bridget responds that the court did not double-count or misidentify these assets, but was instead just "simply stating a summary of the evidence the Court reviewed from the documents submitted by the parties." We agree with Bridget.

The district court "was placed in the unenviable position" of determining the value of Turf-Pro without help from expert testimony. *See Keener*, 728 N.W.2d at 194. The court recognized this quandary in observing that it was "at an obvious and significant disadvantage in valuing" the business, which it determined was worth $100,000.00 after examining the parties' tax returns. "Because of the difficulty surrounding valuation, appellate courts give much leeway to the trial court." *Id.* As a result, we will not disturb a trial court's valuation "when it is within the range of evidence." We also defer to those "valuations when accompanied by supporting credibility findings or corroborating evidence." *Id.*

The court followed the parties' lead in valuing the three Ford trucks and the 2013 Jeep separately from the business. Only two of those vehicles specifically appear in both the court's discussion of business value and then again as individual items on the property ledger, those being a 2017 Ford F-350 and the 2013 Jeep, together worth $24,187.98. So, assuming these two vehicles were "double-counted," the question is whether the distribution was inequitable to Terry. We conclude it was not, considering the additional equipment the court suspected the business must own but was not disclosed by Terry.

The court's suspicions were supported by the depreciation and amortization report attached to Terry's February 2021 financial affidavit, which listed a number of business assets that were not separately valued by Terry anywhere else, including a building, office equipment, a lift, mowers, a blower, spreading and spraying equipment, power tools, a tractor, a trailer, a snowplow, a 1999 Ford F-250, and an F-250 placed into service in 2018 (likely the one that Terry claims does not exist). Given these other pieces of equipment, plus Bridget's testimony

that her valuation of the business included not just its equipment but its loyal customer base and income,[2] we conclude the court's valuation of the company at $100,000.00 was well within the range of evidence. *See id.*; *see also In re Marriage of Hansen*, 733 N.W.2d 683, 703 (Iowa 2007) ("In ascertaining the value of property, its owner is a competent witness to testify to its market value.").

### 2. Florida condo

Terry next argues the court incorrectly excluded marital funds from the value of the Florida condo. He contends the court "was in error" in accepting Bridget's claim that she found the $20,000.00 in her parents' home, arguing instead that the "money likely came from the parties' joint bank account, as testified by [him]." But the court found Bridget "credibly testified that this . . . money was found in closets, behind dressers, in decorative tins, and in boxes in a crawl space." In contrast, Terry presented no financial documentation to support his claimed version of events. With a record plagued by Terry's lack of candor, and the court's adverse credibility findings against him, we have no trouble rejecting this claim. *See Keener*, 728 N.W.2d at 194.

Terry also argues the court undervalued the condo because it did not accept his higher valuation. The only evidence about how much the condo was worth came from the parties' testimony. Bridget placed its value at $225,000.00 based on what a neighboring unit had sold for. In contrast, Terry testified the condo should be valued at $371,000.00 because an unspecified "Texas firm" was calling him "at least three times a week . . . wanting to purchase" it for that much. While

---

[2] The record shows that from 2016 to 2020, the business averaged gross profits of $360,000.00.

Terry said that he had emails from that firm, he did not present them as evidence. The court was not entirely convinced by either's position, instead finding a value of $250,000.00, "somewhere in between both parties' valuations," was equitable. Though the evidence was informal and lacking in substance, this value was within the range of the evidence and should not be disturbed. *See id.*; *see also In re Marriage of Meints*, No. 21-0172, 2022 WL 244433, at *4 (Iowa Ct. App. Jan. 27, 2022) ("While the evidence was somewhat dicey, the court's valuation was within the range of evidence, so we decline to disturb it.").

### 3. *Side-by-side, hunting and fishing equipment, and Camaro*

Beginning with the side-by-side, Bridget testified that Terry posted a side-by-side on social media, he told their son he had one, and he just traded the old one in for a newer one. Terry, however, testified the side-by-side is owned by his girlfriend and titled in her name, although he gets to use it sometimes. So he contends that it should not have been included in the marital estate. Terry did not, however, produce that title as evidence. Given his exclusion of other assets from his financial affidavits and proposed property distribution, the court found Terry's credibility to be "rather lacking" on this point. Deferring once more to the court's credibility finding, we reject this complaint. *See, e.g.*, *In re Marriage of Baker*, No. 14-1293, 2015 WL 4163351, at *2–3 (Iowa Ct. App. July 9, 2015) (detailing appellate courts' deferential approach to credibility findings, noting, among other things, "only in rare instances would we substitute our own credibility determinations for those of the district court").

Next, Terry argues the court misvalued his hunting and fishing equipment at $6000.00, which he submits was not worth more than "a couple thousand

dollars." He complains Bridget "was unable to identify exactly what he had" and provided only "estimates and guesses to the court." But the record shows Bridget provided an exhaustive list of Terry's equipment,[3] while Terry provided no details about what he has. She also testified that, contrary to Terry's assertions otherwise, "very little" of this property was gifted to him. Because the court's credibility determination as to the side-by-side extended to the equipment, and its valuation fell within the range of the evidence, we affirm on this issue as well. *See id.*; *see also Keener*, 728 N.W.2d at 194.

Turning to the Camaro, Bridget testified that Terry posted it for sale on social media, with comments on the post indicating that he could "get close to 30k" for it. Bridget explained that Terry purchased the vehicle as a shell about thirteen years earlier for "right around $14,000." Over the years, Terry put roughly $60,000.00 into the car in developing it into a drag racer. With these figures in mind, Bridget valued the car at $20,000.00. But at trial, Terry claimed that he was only a one-third owner of the car, despite having posted it for sale. Again, the court did not find that claim credible, noting that "like all of the Turf-Pro equipment, this vehicle was not listed in Terry's financial affidavit at all" and, even though ownership of a vehicle is easy to prove, "Terry brought forth no title document" to support his claim. Like a record on repeat, we defer to these credibility findings. *See Keener*, 728 N.W.2d at 194.

---

[3] She testified that he had three assault rifles, "at least one handgun if not two, several shotguns and rifles," fishing tents, Vexilar depth finders, decoys, ice augers, fishing poles, bows and arrows, tree stands, and a blind.

### 4. Jewelry

Finally, Terry argues the court erred in awarding Bridget's jewelry to her but not including its value in the equalization ledger. Bridget testified that she has jewelry consisting of necklaces Terry bought her for Christmas over the years, which she estimated was worth a total of about $2000.00. Following the theme of this litigation, Terry testified Bridget bought her jewelry for herself.

Iowa Code section 598.21(5) excludes gifted property, interspousal or not, from the marital estate so long as exclusion does not result in an inequity. *See In re Marriage of Fenton*, No. 09-1948, 2010 WL 2925907, at *6 (Iowa Ct. App. July 28, 2010). In the grand scheme of things, we see no inequity to Terry by excluding the value of this gifted jewelry.

### B. Spousal Support

For his final claim, Terry argues the spousal support award in favor of Bridget is "too much for too long," given "Bridget's good health, her share of the marital property, extensive experience and work history in the lawn care industry, and her deliberate choice to be underemployed following her move to Florida."

The district court is given "considerable latitude" in spousal support decisions. *In re Marriage of Mills*, 983 N.W.2d 61, 67 (Iowa 2022) (citation omitted). "The institutional deference afforded the district court in determining spousal support counsels against undue tinkering with spousal support awards" unless "there has been a failure to do equity." *In re Marriage of Sokol*, 985 N.W.2d 177, 182 (Iowa 2023) (citation omitted). After considering the factors listed in Iowa Code section 598.21A(1), the court may grant an award of spousal support in an amount and duration that is "tailored to achieve the underlying equitable purpose

of the spousal support award." *See id.* at 185. Here, the court stated its purpose in awarding Bridget spousal support was to provide her with "a standard of living that is more commensurate with the standard of living she enjoyed during the course of the parties' marriage," which is the goal of a traditional spousal support award. *See id.*

We find such an award was warranted given the nearly twenty-five years the parties were married, Terry's higher income, and his receipt of all the income-producing assets of the marriage. *See* Iowa Code § 598.21A(1)(a), (c). Terry does not really challenge these factors. He instead asserts that Bridget has "extensive work history in the lawn care business" and that "she could earn a significant higher income" if she returned to that field where she lives. The evidence does not support that assertion.

Bridget testified her income is reasonable in her geographic area, and Terry offered no evidence to dispute that. He only testified: "I work every day, and so can she." But Bridget is employed full time, just like Terry. And there was no evidence that she could earn more doing lawn care in Florida based on her experience. *See In re Marriage of Kreuder*, No. 13-0776, 2014 WL 1714486, at *3 (Iowa Ct. App. Apr. 30, 2014) (affirming award where "there was no evidence that she was earning below her earning capacity"); *In re Marriage of Wasson*, No. 12-1033, 2013 WL 2637576, at *4 (Iowa Ct. App. June 12, 2013) (rejecting challenge to spousal support award where "no evidence was offered as to any possible full[-]time positions that were available and appropriate for [wife]'s skill set"); *In re Marriage of Schriner*, 695 N.W.2d 493, 501 (Iowa 2005) (affirming spousal support award where "there was no evidence in this case that [wife]'s

earnings were not commensurate with her earning capacity."); *cf. Pazhoor*, 971 N.W.2d at 542 (noting "[t]he court of appeals correctly measured [wife]'s earning capacity [as minimal] because '[n]o evidence was presented concerning any full-time employment [she] could obtain'" and finding "[t]his factor weighs heavily in favor of support") (third alteration in original).

Indeed, the evidence shows that Bridget was not compensated much for her work at Turf-Pro before the parties' separation. The tax return for the last full year Bridget worked for the business as a "laborer," in 2018, shows Bridget's net profit from the business was only $6000.00, while Terry's was $83,907.00. Those figures did not change much in the 2019 return, although they drastically changed in 2020 after Bridget filed for divorce, with Terry's net profit somehow shrinking to $43,457.00 and the business issuing Bridget a 1099-NEC form showing nonemployee compensation of $22,002.61. This historical record supports Bridget's testimony that her earning capacity is much less than Terry's, which also supports an award of spousal support. *See* Iowa Code § 598.21A(1)(e).

Finally, we have factored in the parties' comfortable lifestyle during their marriage—vacationing, driving nice vehicles, and not worrying about spending money. Since their separation, only Terry has continued to live that life. Bridget suffers a budget deficit, while Terry enjoys a surplus, even ignoring the fact that he uses the business to cover most of his personal expenses. Because Bridget "cannot support herself at a standard of living comparable to the lifestyle she enjoyed while married," this factor also warrants spousal support. *Pazhoor*, 917 N.W.2d at 542; *accord* Iowa Code § 598.21A(1)(f).

While there are some factors that cut against spousal support, like the parties' ages, good health, and similar education levels, *see* Iowa Code § 598.21A(1)(b), (d), the ones that we have discussed above convince us that the court's award was equitable, both in its amount and duration. Granting Bridget's request for $600.00 per month until she reaches retirement age equitably balances out her budget deficit, while still leaving Terry well in the black. Indeed, Terry does not argue he is unable to pay. By the time Bridget turns sixty-five and spousal support ends, Bridget will be better able to maintain a standard of living comparable to that she enjoyed during the marriage by using retirement benefits and assets. For these reasons, we affirm the spousal support awarded to Bridget.

### C.  Appellate Attorney Fees

In the conclusion of her brief, Bridget asks that the court award her $4000.00 in appellate attorney fees. An award of appellate attorney fees is not a matter of right but rests within the appellate court's discretion. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). The court considers "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005).

Given the income disparity between the parties and the merits of Bridget's appeal, we find her request for appellate attorney fees should be granted. But because she did not submit an affidavit or fee itemization to support her request, we remand the issue of appellate attorney fees to the district court to determine a reasonable award. *See In re Marriage of Heiar*, 954 N.W.2d 464, 473–74 (Iowa Ct. App. 2020) ("[W]e are unable to determine a reasonable award without more specific details of how the fees were incurred for this appeal.").

**IV.     Conclusion**

We affirm the decision of the district court and remand for the determination of an award of reasonable appellate attorney fees in favor of Bridget.

**AFFIRMED AND REMANDED.**